**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OSAMA ABDELHAMID,<br>*Plaintiff*,<br>v.<br>LANE CONSTRUCTION CORPORATION,<br>*Defendant*. | Civil Action No. 23 - 2472 (LLA) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Osama Abdelhamid, proceeding pro se, brings this action against his former employer, Defendant Lane Construction Corporation, alleging discrimination on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ECF No. 1.[1] Pending before the court are Lane's motions for summary judgment, ECF No. 37, and for attorney's fees, ECF No. 42. For the following reasons, the court denies Lane's motion for summary judgment and grants its motion for attorney's fees.

## I. FACTUAL BACKGROUND

The following facts are undisputed, unless otherwise noted. Lane is a private construction company that specializes in complex civil infrastructure projects. ECF No. 37, at 43; ECF No. 40-1, at 1.[2] Mr. Abdelhamid is an Egyptian national who was born in Kuwait. ECF

[1] Mr. Abdelhamid also brought a retaliation claim, which the court previously dismissed. ECF No. 12, at 13-19.

[2] When citing the parties' filings and exhibits, the court refers to the CM/ECF-generated numbers at the top of each page rather than any internal pagination.

No. 29-23, at 4; ECF No. 37, at 47.[3] He has a bachelor's degree in mechanical engineering from an Egyptian university, and he moved to the United States in 2016 to work at a different construction company. ECF No. 29-23, at 6; ECF No. 37, at 48.

In July 2021, Lane hired Mr. Abdelhamid as a Contracts Manager for the Northeast Boundary Tunnel ("NEBT") project, which concerned the District of Columbia's sewer system. ECF No. 1, at 2; ECF No. 37, at 48. Mr. Abdelhamid was an at-will employee and reported directly to Fabio Ciciotti, the NEBT Project Director, and indirectly to Chad Curran, Lane's Contracts and Claims Director. ECF No. 29-23, at 8-10; ECF No. 37, at 48-49. Mr. Ciciotti reported to Lane's Vice President, Daniele Nebbia. ECF No. 37, at 49. In his role as a Contracts Manager, Mr. Abdelhamid was responsible for "helping" Mr. Ciciotti navigate "contractual, . . . commercial, and legal challenges in the project" and "support the construction team." ECF No. 29-23, at 8.

### A. First Subcontractor Dispute and Mediation

In 2021, Lane became involved in a dispute with two of the NEBT Project's subcontractors, which claimed Lane owed them additional payments. ECF No. 37, at 49. Lane and the subcontractors agreed to mediate the dispute, and, among others, Mr. Ciciotti, Mr. Nebbia, Mr. Abdelhamid, and Lane's Assistant General Counsel, Allen Wiggins, attended the mediation in October 2021. *Id.*

During the mediation, Mr. Abdelhamid told the mediator that Lane had a stronger legal position than the subcontractors, and he recommended that Lane arbitrate the matter instead of

---

[3] Record materials frequently refer to Mr. Abdelhamid as "Mr. Karam," which is his family's surname. *See* ECF No. 29-23, at 3.

settling. *Id.* at 49-50; *see* ECF No. 29-23, at 27-28. Mr. Nebbia and Mr. Wiggins stated in their declarations that Mr. Abdelhamid "repeatedly interrupted [the mediator] and argued stridently with him over the merits of the case." ECF No. 29-1, at 7 (Mr. Nebbia); ECF No. 29-24, at 2 (Mr. Wiggins).[4] Mr. Abdelhamid "showed such a level of disrespect and rudeness toward" the mediator that, at some point, the mediator expressed his preference "to communicate only with" Mr. Nebbia and Mr. Wiggins, even though they were attending the mediation remotely, whereas Mr. Abdelhamid was attending in person. ECF No. 29-1, at 7 (Mr. Nebbia); *see* ECF No. 37-1, at 9-10 (Mr. Nebbia's deposition describing Mr. Abdelhamid's "arguing, taking various positions, and not really respecting even the . . . mediator"). Mr. Abdelhamid did not recall the mediator

---

[4] Mr. Abdelhamid raises an evidentiary objection to Lane's account of the mediation under Federal Rules of Evidence 408 and 802 "to the extent [evidence is] offered for the truth or to prove performance/legitimacy." ECF No. 40-1, at 1. Federal Rule of Evidence 408 prohibits the admission of "statement[s] made during compromise negotiations" used "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement." Fed. R. Evid. 408(a)(2). But "the court may admit [such] evidence for another purpose." *Id.* 408(b). Rule 408 presents no bar here because Lane offers information about its settlement negotiations with the subcontractors to provide examples of Mr. Abdelhamid's unprofessional behavior, not to prove or disprove the validity of the subcontractors' claim. Likewise, Federal Rule of Evidence 802, which generally bars the admission of hearsay, does not bar evidence about the mediation because individuals who were present at the mediation, such as Mr. Nebbia, can testify about the events at trial. Because the statements can be "converted into admissible evidence," the court may consider them at this stage. *Richards v. Option One Mortg. Corp.*, No. 08-CV-7, 2009 WL 2751831, at *1 n.3 (D.D.C. Aug. 28, 2009) (quoting *Wilburn v. Robinson*, 480 F.3d 1140, 1143 n.2 (D.C. Cir. 2007)). In the alternative, Mr. Abdelhamid "disputes [the] characterization and materiality" of the mediation-related facts, ECF No. 40-1, at 1, but he does not articulate any specific objections. For example, Mr. Abdelhamid does not dispute that he repeatedly interrupted the mediator. *See generally id.* Accordingly, the court "may assume that facts identified by [Lane] in its statement of material facts are admitted" because Mr. Abdelhamid has not controverted those facts in his opposition. Local Civ. R. 7(h)(1); *see Bastani v. Am. Fed'n of Gov't Emps., AFL-CIO*, 70 F.4th 563 (D.C. Cir. 2023) ("To withstand summary judgment, the nonmoving party must identify 'specific facts' in the record 'showing that there is a genuine issue for trial.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986))).

becoming "frustrated" with him. ECF No. 29-23, at 28.[5] Mr. Nebbia and Mr. Wiggins disagreed with Mr. Abdelhamid's recommendation at the mediation and decided to settle the matter. ECF No. 29-1, at 7 (Mr. Nebbia); ECF No. 29-24, at 3 (Mr. Wiggins). Mr. Abdelhamid testified at his deposition that he received positive feedback from Mr. Nebbia after the mediation. ECF No. 29-23, at 28.

A few days after the mediation, Lane and the subcontractors entered into a settlement agreement. ECF No. 37, at 51. Mr. Abdelhamid was not involved in negotiating or drafting the settlement agreement. *Id.*; ECF No. 29-23, at 29. About a week later, Mr. Abdelhamid sent an email to Mr. Ciciotti, with Mr. Nebbia and Mr. Wiggins copied, stating that he believed the settlement agreement would expose Lane to liability under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ECF No. 29-23, at 29; ECF No. 37, at 51; *see* ECF No. 29-25, at 2-3. In response, Mr. Wiggins wrote that he appreciated Mr. Abdelhamid's "taking the time to analyze the recent Settlement Agreement [and] . . . put [his] thoughts together," but that he disagreed with Mr. Abdelhamid's assessment because he was "not aware of anything associated with this settlement [] that would constitute or lead to a false claim." ECF No. 29-26, at 2.

### B. Second Subcontractor Dispute

In December 2021, a different subcontractor sued Lane and related entities for breach of contract in the Superior Court of the District of Columbia. ECF No. 37, at 53. Shortly after Lane

---

[5] In his deposition, Mr. Abdelhamid testified that Mr. Nebbia had directed him to speak at the mediation because he had prepared the relevant documents, but that Mr. Nebbia "started interrupting, taking over, listening to the mediator, and just blindly following what [the mediator] was saying." ECF No. 29-23, at 27-28. Mr. Abdelhamid also stated that the mediator "always trie[d] to interrupt" him. *Id.* While Mr. Abdelhamid maintains that others in the mediation were interrupting him and each other, he does not dispute Lane's assertion that he was also interrupting the mediator. *See generally* ECF No. 40-1.

was served, Christopher Ciancanelli, one of Lane's attorneys, circulated the complaint to other employees and noted that Lane's deadline to respond was January 27, 2022. *Id.* at 53-54; *see* ECF No. 29-27, at 3.

Over the next two weeks, Lane employees, including Mr. Abdelhamid, deliberated over how to proceed. *See* ECF No. 37, at 54-65. On January 18, 2022, Mr. Ciancanelli, Mr. Abdelhamid, and other members of the NEBT Project team met to discuss the suit. *Id.* at 55; *see* ECF No. 29-35, at 15. After the meeting, Mr. Abdelhamid sent Mr. Ciancanelli an email conveying the NEBT Project team's recommendation that Lane file a motion to dismiss the subcontractor's suit and to compel arbitration. ECF No. 29-23, at 36-37; ECF No. 37, at 55-56; *see* ECF No. 29-35, at 14. He further advised that Lane should agree to settlement discussions before arbitration only if the subcontractor proposed it first. ECF No. 29-23, at 37; ECF No. 37, at 55-56; *see* ECF No. 29-35, at 14. Mr. Ciancanelli, after consulting with outside counsel and Mr. Nebbia, sent an email stating that Mr. Nebbia had agreed with the team's recommendation, with the only adjustment being that Lane would give the subcontractor "some time to make the first move." ECF No. 29-35, at 13; *see* ECF No. 29-23, at 37; ECF No. 29-44, at 2-7; ECF No. 29-45, at 2-3; ECF No. 37, at 56-57. Mr. Abdelhamid replied that he and his team agreed with this approach, noting that the "only thing remaining [wa]s to decide" how long Lane would wait for the subcontractor to make a move. ECF No. 29-35, at 12-13; *see* ECF No. 37, at 57. In response, Mr. Ciancanelli advised that the subcontractor had "no reason or motivation" to move until Lane filed a motion to arbitrate or an answer to the complaint, and that Lane would proceed by moving the dispute to arbitration. ECF No. 29-35, at 11-12; *see* ECF No. 37, at 57-58. Mr. Abdelhamid replied that Lane's outside counsel could "proceed as agreed." ECF No. 29-35, at 11; *see* ECF No. 37, at 58.

On the morning of January 26, 2022, Mr. Ciancanelli sent an email to Mr. Nebbia, Mr. Abdelhamid, and the rest of the NEBT Project team, stating that Lane's outside counsel had been discussing the prospect of arbitration with opposing counsel and that the parties had agreed to a fourteen-day extension for Lane to respond to the complaint to allow the parties time to resolve the dispute. ECF No. 37, at 58; *see* ECF No. 29-35, at 9. Mr. Abdelhamid responded that the fourteen-day extension "will not save us anything" and requested that Lane seek arbitration the following day. ECF No. 29-35, at 8-9; *see* ECF No. 29-23, at 39; ECF No. 37, at 58.

Later that day, Mr. Ciancanelli spoke with Mr. Abdelhamid and other NEBT Project team members on the phone. ECF No. 29-23, at 39-41; ECF No. 29-30, at 4-5; ECF No. 37, at 58. Mr. Abdelhamid repeated his recommendation, with which Mr. Ciancanelli disagreed, that Lane move to compel arbitration the following day to exert pressure on the subcontractor to voluntarily dismiss its complaint. ECF No. 29-23, at 40-41; ECF No. 37, at 58-59. Mr. Abdelhamid sent a follow-up email after the call reiterating his views. ECF No. 29-23, at 40; ECF No. 37, at 59; *see* ECF No. 29-35, at 7. Mr. Ciancanelli then communicated this disagreement to Mr. Nebbia, who had the final say on how to proceed. ECF No. 37, at 59; *see* ECF No. 29-54, at 3. After consulting with Mr. Ciancanelli and another colleague, Mr. Nebbia agreed with Mr. Ciancanelli's approach. ECF No. 37, at 59-61; *see* ECF No. 29-58, at 2.

Later that afternoon, Mr. Ciancanelli sent an email to Mr. Abdelhamid and the NEBT Project team updating them that he had discussed the matter with Mr. Nebbia and Lane would "proceed as . . . previously discussed"—meaning that Lane would file a motion to compel arbitration within the extended time period. ECF No. 29-35, at 6; *see* ECF No. 29-23, at 40; ECF No. 37, at 61. Mr. Ciancanelli wrote that Lane would give the subcontractor a chance to initiate negotiations, but if it did not do so, Lane would "engage with [the subcontractor] prior to [Lane's]

having to do anything more with the arbitration." ECF No. 29-35, at 6. Twenty-one minutes later, Mr. Abdelhamid replied:

> Chris [Ciancanelli],
>
> We specifically requested for **[Lane's outside counsel] to inform [the subcontractor]'s attorney with our decision today, before filing the motion tomorrow.**
>
> [Outside counsel] shouldn't have agreed with them to file a motion for extension without our consent. However, we iterated our decision for the way forward through email twice and through a phone call as well earlier today.
>
> Deciding not to go with our decision earlier and waiting until the end of the day made us miss the opportunity for [the subcontractor] to have one day to reconsider their approach and withdraw their case, and **we will end up paying $3,000.00 from the Project budget that could've been saved.**
>
> Again, as clarified during our initial call [a] few days ago, as well as today's call, **unless our legal department specifically advises for any weak point(s) in our position that would form a risk, we will not accept to settle with [the subcontractor] by giving them free money without justification.**
>
> Please do not proceed further with this case in any different direction or timing other than what has been already discussed and agreed.
>
> Trust the above is clear.

ECF No. 29-35, at 5-6. Mr. Nebbia, who was copied on the email, immediately called Mr. Ciciotti. ECF No. 29-1 at 11-12; ECF No. 37, at 62; *see* ECF No. 29-35, at 5. Mr. Nebbia and Mr. Ciciotti "agreed that the tone of Mr. [Abdelhamid]'s email was unacceptable, not productive[,] and not consistent with Lane's values and culture of teamwork and respect." ECF No. 29-1 at 11-12 (Mr. Nebbia); ECF No. 29-68 at 4 (Mr. Ciciotti).

Mr. Nebbia replied to Mr. Abdelhamid's email, "Osama – the tone of this email to a colleague is unacceptable[.] I just talked to Fabio [Ciciotti], he will discuss with you." ECF

No. 29-35, at 4-5. Mr. Abdelhamid responded, "With all due respect, the tone of the email is irrelevant as long as what is being discussed is purely work-related matters. I apologize if the email was interpreted in a different way than what was intended, but I do believe that the email does not address anything outside [the subcontractor]'s [l]awsuit." *Id.* at 4.[6]

Mr. Ciciotti met with Mr. Abdelhamid later that day. ECF No. 37, at 63. Mr. Abdelhamid testified in his deposition that Mr. Ciciotti did not find his email "offensive" and it was Mr. Ciancanelli who had "complained" about the tone of the email. ECF No. 29-23, at 46-47. Mr. Ciciotti stated in his declaration that he advised Mr. Abdelhamid at their meeting that the tone of his email to Mr. Ciancanelli was unacceptable and should not have been sent to a colleague on his team. ECF No. 29-68 at 4. Mr. Ciciotti noted that Mr. Abdelhamid "pushed back and was not open or receptive to [his] views and the discussion was unproductive." *Id.* Mr. Nebbia then scheduled a meeting for the following day with Suaydy Canales, Lane's Human Resources ("HR") Manager, to discuss the email with Mr. Abdelhamid. ECF No. 37, at 63; *see* ECF No. 29-6, at 2; ECF No. 29-23, at 56. Mr. Nebbia wrote in his email to Ms. Canales that "[d]epending on the outcome of the conversation[,] we may issue a verbal warning." ECF No. 29-6, at 2.

### C. Communication Skills Courses

The next day, on January 27, 2022, Mr. Nebbia, Mr. Ciciotti, and Ms. Canales spoke with Mr. Abdelhamid over the phone. ECF No. 29-23, at 56-57; ECF No. 37, at 65. Mr. Nebbia

---

[6] Later that day, Mr. Ciancanelli sent an email stating that he "appreciate[d] [Mr. Abdelhamid's] enthusiasm for protecting our interests and wanting to hold the subcontractors responsible," and that Mr. Abdelhamid should "[p]lease know that we discussed the issues you raised below with [Mr. Nebbia] and proceeded from there." ECF No. 29-35, at 3. Mr. Abdelhamid responded the next morning, stating that Mr. Ciancanelli had disregarded their earlier conversations, ignored his team's efforts, and "skipped [the] step" of informing the subcontractor that Lane intended to move for arbitration. *Id.* at 2-3.

emphasized "Lane's values of teamwork and mutual respect among colleagues" and advised Mr. Abdelhamid that "the tone of his communications were perceived by both an outside observer like [Mr. Nebbia] and other colleagues, including his supervisor, Mr. Ciciotti, and . . . Ms. Canales, to be not acceptable or productive for resolving issues." ECF No. 29-1, at 14; *see* ECF No. 37, at 65-66. Mr. Nebbia and Mr. Ciciotti stated in their declarations that Mr. Abdelhamid "immediately became angry and dismissed the feedback." ECF No. 29-1, at 14 (Mr. Nebbia); ECF No. 29-68, at 6 (Mr. Ciciotti). Mr. Nebbia advised that Mr. Abdelhamid would benefit by improving his communication skills and self-awareness, and Mr. Nebbia recommended that Mr. Abdelhamid take two online courses to improve his communication skills. ECF No. 29-1, at 14-15. According to Mr. Nebbia and Mr. Ciciotti, Mr. Abdelhamid objected, stating "repeatedly that there was nothing he needed to consider to improve his job performance." *Id.* at 14 (Mr. Nebbia); ECF No. 29-68, at 6 (Mr. Ciciotti). According to Mr. Abdelhamid, Mr. Nebbia advised him to take the communications courses "[b]ecause [Mr. Nebbia] thought that [he] was taking things too seriously." ECF No. 29-23, at 57. Mr. Nebbia testified in his deposition that the purpose of the meeting was to train Mr. Abdelhamid "to be successful in [his] work," but Mr. Abdelhamid "show[ed] sign[s] of distress and anger" and refused to "accept[] any feedback." ECF No. 37-1, at 5.

Mr. Nebbia told Mr. Abdelhamid that he would schedule another meeting in two weeks to "close the loop" after Mr. Abdelhamid had completed the communications courses. ECF No. 29-1, at 15; *see* ECF No. 29-8, at 2-4; ECF No. 29-23, at 57; ECF No. 37, at 66. Mr. Abdelhamid replied via email thanking Mr. Nebbia for "today's advice" and stating that he was "[l]ooking forward to the next meeting." ECF No. 29-8, at 2. That same day, Mr. Nebbia also sent an email to Mr. Ciancanelli stating that Mr. Abdelhamid's communication had been

unacceptable, apologizing on Mr. Abdelhamid's behalf, and notifying Mr. Ciancanelli that he had directed Mr. Abdelhamid to complete courses to improve his communication skills. ECF No. 37, at 67-68; *see* ECF No. 29-36, at 2. In a separate email thread with other lawyers at Lane, Mr. Wiggins expressed confusion about Mr. Abdelhamid's emails, asking, "Why is [Mr. Abdelhamid] dictating legal strategy?" ECF No. 29-34, at 2.

In late January 2022, Lane completed Mr. Abdelhamid's 2021 performance review. ECF No. 37, at 68-69; *see* ECF No. 29-9. Mr. Ciciotti gave Mr. Abdelhamid positive ratings, noting that he "ha[d] exceeded expectations for the position he holds." ECF No. 29-9, at 2. Mr. Curran, however, noted that Mr. Abdelhamid's "continued opposition to the settlement process has led to avoidance of interaction thus nullifying any positive outcome that [Mr. Abdelhamid] can contribute to the process." *Id.* at 3. Mr. Curran thus "encourage[d]" Mr. Abdelhamid to "[b]e open to opposing viewpoints and always consider the least cost solution when advocating for a business decision path forward." *Id.* at 4.

**D. Performance Improvement Plan and Termination**

On February 18, 2022, Mr. Nebbia, Mr. Ciciotti, and Ms. Canales met with Mr. Abdelhamid to follow up on Mr. Abdelhamid's online communication skills courses. ECF No. 29-23, at 58; ECF No. 37, at 69-70. According to Mr. Nebbia and Mr. Ciciotti, Mr. Abdelhamid responded "no" when they asked if he had learned anything from the courses that could apply to his work. ECF No. 29-1, at 16 (Mr. Nebbia); ECF No. 29-68, at 8 (Mr. Ciciotti); *see* ECF No. 37, at 69. Mr. Nebbia and Ms. Canales advised Mr. Abdelhamid that his attitude at the time and in recent interactions showed that he needed to improve his level of self-awareness and behavior during difficult conversations. ECF No. 29-1, at 16-17; *see* ECF No. 29-68, at 8; ECF No. 37, at 69-70; *see also* ECF No. 29-23, at 58 (Mr. Abdelhamid's deposition testimony that

"Mr. Nebbia is telling me that I did something wrong without giving me any kind of reference to why he decided that this is something wrong."). Mr. Nebbia and Mr. Ciciotti stated in their declarations that Mr. Abdelhamid again "strenuously disagreed" and became "agitated," and Mr. Nebbia decided to end the call. ECF No. 29-1, at 17 (Mr. Nebbia); ECF No. 29-68, at 8 (Mr. Ciciotti); *see* ECF No. 37, at 70. Afterward, Mr. Nebbia sent an email to Mr. Ciciotti, with other Lane personnel copied:

> As discussed, based on the interactions over the last month, I am very concern with Osama:
>
> - level of self-awareness during normal and difficult conversations
> - limited interest in listening to constructive feedbacks from his manager and others
> - written communications toward peers or corporate
> - performance and attitude during negotiation [during the first subcontractor dispute]
>
> More in general, I'm concern with Osama['s] misalignment with some of Lane Company values and culture.

ECF No. 29-10, at 2. In the same email, Mr. Nebbia directed Mr. Ciciotti to draft a performance improvement plan ("PIP") for Mr. Abdelhamid addressing these concerns. *Id.*; ECF No. 29-23, at 59; ECF No. 37, at 70. Mr. Nebbia also "strongly recommend[ed]" that, in the meantime, Mr. Abdelhamid "avoid . . . [having] any direct contact with D.C. Water," one of Lane's customers, and, at a minimum, "limit" his "direct contact with [s]ubcontractors." ECF No. 29-10, at 2; *see* ECF No. 29-23, at 59-60; ECF No. 37, at 70-71.

Mr. Ciciotti responded that Lane could not afford to change the NEBT Contracts Manager position before finding a replacement. ECF No. 29-68, at 9. Mr. Ciciotti agreed that Mr. Abdelhamid should be placed on a PIP but said that he wanted to gauge Mr. Abdelhamid's

reaction about a PIP first. *Id.* Mr. Nebbia later advised colleagues over email that it would be "a good idea to be ready for the worst-case scenario, with someone to replace [Mr. Abdelhamid]." ECF No. 29-12, at 2. Mr. Curran subsequently provided Mr. Nebbia with two resumes of candidates for Mr. Abdelhamid's position. ECF No. 29-13, at 2. Mr. Ciciotti stated in his declaration that he discussed the prospect of a PIP with Mr. Abdelhamid, who "objected that [a PIP] was unnecessary." ECF No. 29-68, at 10. Mr. Ciciotti "told [Mr. Abdelhamid] that that was the procedure we needed to follow and that everything would be alright after the PIP was in place," but Mr. Abdelhamid still "disagreed with that course of action." *Id.*

On February 24, 2022, Mr. Ciciotti and Mr. Nebbia met with Mr. Abdelhamid to present him with the PIP, which was for a thirty-day period. ECF No. 29-23, at 60-61; ECF No. 37, at 72; *see* ECF No. 29-14, at 2-3; ECF No. 40-2, at 6-7. The PIP identified Mr. Abdelhamid's "performance concerns" as "[l]evel of self-awareness during normal and difficult conversations," "[l]evel of understanding of the counterpart during difficult conversations," "appear[ing] to be not open[] to receive different opinion[s] and suggestions," and "written communications toward peers or corporate," including "the specific email sent to [the] legal department." ECF No. 29-14, at 2-3. The PIP's objectives were "[i]mprov[ing] the level of self-awareness during difficult conversations," "[p]osition[ing] yourself in the best way to deliver clearly and productively your message," "having a decisive but relaxed attitude during conversation," "be[ing] open to feedback[] and seek[ing] [] continuous improvements," and "[i]mproving the perception of the consequences that too strong attitudes can have in interpersonal relationships." *Id.* The PIP directed Mr. Abdelhamid to prepare a plan identifying areas for improvement and to submit to Mr. Ciciotti a proposed training plan on ways to improve. *Id.*

Mr. Nebbia recalled that, at the February 24 meeting, he advised Mr. Abdelhamid that Lane would cover the cost of any training and that Lane wished to help Mr. Abdelhamid be successful in his work. ECF No. 29-1, at 19; ECF No. 37, at 73; *see* ECF No. 29-22, at 3 (Mr. Nebbia's notes from the following day recounting the meeting). Mr. Nebbia and Mr. Ciciotti stated in their declarations that Mr. Abdelhamid "appeared resistant and dismissive." ECF No. 29-1, at 19 (Mr. Nebbia); ECF No. 29-68, at 11 (Mr. Ciciotti). Mr. Nebbia then asked Mr. Abdelhamid "if the plan was crazy," and he responded, "yes." ECF No. 29-1, at 19 (internal quotation marks omitted); ECF No. 29-68, at 11 (internal quotation marks omitted); *see* ECF No. 29-22, at 3. Mr. Nebbia stated that he asked Mr. Abdelhamid to focus on their feedback based on more recent interactions, rather than solely his email to Mr. Ciancanelli. ECF No. 29-1, at 19-20; ECF No. 29-68, at 11; *see* ECF No. 29-22, at 3. Mr. Nebbia and Mr. Ciciotti recounted that, as Mr. Nebbia explained how recent calls and interactions demonstrated Mr. Abdelhamid's issues with his self-awareness and communication skills, Mr. Abdelhamid "again strenuously disagreed and became visibly angry." ECF No. 29-1, at 20 (Mr. Nebbia); ECF No. 29-68, at 11 (Mr. Ciciotti).

According to Mr. Nebbia and Mr. Ciciotti, Mr. Abdelhamid asked what would happen if he refused to sign the PIP, and Mr. Nebbia responded that it would be considered a refusal to follow directions and Lane would take appropriate disciplinary measures, including termination if necessary. ECF No. 29-1, at 20 (Mr. Nebbia); ECF No. 29-68, at 11 (Mr. Ciciotti); *see* ECF No. 29-22, at 3 (Mr. Nebbia's notes). Mr. Abdelhamid responded that he would not accept the PIP, that he would not discuss the PIP further without his attorney and Ms. Canales present, and that the PIP was retaliatory. ECF No. 29-1, at 20 (Mr. Nebbia); ECF No. 29-23, at 61 (Mr. Abdelhamid); ECF No. 29-68, at 11-12 (Mr. Ciciotti); *see* ECF No. 29-22, at 4. Mr. Nebbia

said that Lane did not want him to leave the room and refuse the PIP, but Mr. Abdelhamid continued to move toward the door. ECF No. 29-1, at 20; ECF No. 29-68, at 12; *see* ECF No. 29-22, at 4. As Mr. Abdelhamid was leaving, Mr. Nebbia asked if he wanted a copy of the PIP, and Mr. Abdelhamid responded "no" and left the meeting. ECF No. 29-1, at 20 (internal quotation marks omitted); ECF No. 29-68, at 12 (internal quotation marks omitted); *see* ECF No. 29-22, at 4.

Mr. Abdelhamid stated in his interrogatory responses that during the meeting, Mr. Nebbia also told him, "Your style doesn't fit into the company culture here." ECF No. 29-70, at 5 (internal quotation marks omitted). And in his deposition, Mr. Abdelhamid testified that toward the end of the meeting, Mr. Nebbia "said something along the lines of, I know that you are different and I know that you might think differently, but we all need to follow the American culture of the company." ECF No. 29-23, at 12. Mr. Abdelhamid responded by asking, "what do you mean I'm different? I'm asking you if I did something that's not in line with the code of conduct. If not, then it's perfectly fine." *Id.* Then, according to Mr. Abdelhamid, Mr. Nebbia "started to back up a little bit and said, no, no, no, I don't mean it that way." *Id.* Mr. Abdelhamid testified that he felt like he was "being discriminated against," and he asked to leave the meeting. *Id.* In his deposition, Mr. Nebbia denied making any statements that Mr. Abdelhamid was "different" or referring to his "culture as far as nation of origin." ECF No. 37-1, at 8. Mr. Nebbia testified that they "talk[ed] multiple times about the culture of [the] company, in [his] interest [that Mr. Abdelhamid] align with the culture of Lane." *Id.*

After Mr. Abdelhamid left the meeting, Mr. Ciciotti signed Mr. Abdelhamid's PIP and wrote, "Employee refused to sign it." ECF No. 29-14, at 3; *see* ECF No. 37, at 74. Mr. Nebbia emailed Ms. Canales an update after the meeting, stating:

> Osama didn't want to sign and disagreed with the plan.
>
> He said that he sees this "as retaliation" and any further correspondence will have to happen through his lawyer and in presence of HR Corporate.
>
> Obviously not a good outcome.
>
> I'll call you later to discuss.

ECF No. 29-15, at 2. Mr. Nebbia directed Ms. Canales to schedule a meeting for the next day at 3:00 p.m. so that he, Mr. Ciciotti, and Ms. Canales could further discuss the PIP with Mr. Abdelhamid. ECF No. 29-1, at 21; ECF No. 37, at 75.

The next morning, on February 25, 2022, Ms. Canales sent an invitation for the 3:00 p.m. meeting later that day. ECF No. 29-23, at 61; ECF No. 37, at 75; *see* ECF No. 29-18, at 2. Mr. Nebbia also composed an email containing notes about Mr. Abdelhamid's communications and interactions from January 26, 2022 to February 24, 2022. *See* ECF No. 29-22 at 2-4.

At 11:55 a.m., Mr. Abdelhamid sent Ms. Canales an email explaining that he had been asked to sign a PIP the previous day, which, in his view, was "baseless." ECF No. 29-18, at 2. He stated that he had "expressed [his] concern" at the meeting with Mr. Nebbia and Mr. Ciciotti that he was "suffering from an act of Intimidation & Discrimination, while being threatened to face Retaliation in case [he] showed any sign of disagreement." *Id.* Mr. Abdelhamid "respectfully decline[d] attending" the 3:00 p.m. meeting because it was too "short notice to have [his] legal representative present." *Id.* at 3. About thirty minutes later, Ms. Canales forwarded Mr. Abdelhamid's email to David Bondanza, Lane's Assistant General Counsel, as well as

Mr. Ciciotti and Mr. Nebbia. *Id.* at 2; *see* ECF No. 29-1, at 22. Ms. Canales "propose[d] writing a letter of separation and sending it to [Mr. Abdelhamid], since he refuses to meet with us." ECF No. 29-18, at 3. Mr. Nebbia "agreed [] and authorized" Ms. Canales to do so, ECF No. 29-1, at 22, and Mr. Bondanza directed Ms. Canales to draft a termination letter, which would be sent overnight, ECF No. 29-18, at 2; ECF No. 29-69, at 3.

About an hour after emailing Ms. Canales, Mr. Abdelhamid sent an email to Mr. Curran, with Mr. Wiggins and Lane's General Counsel copied, with the subject line, "Urgent Discrimination Issue – Action is Needed." ECF No. 29-19, at 2-4. In the email, Mr. Abdelhamid described recent events relating to the subcontractor's lawsuit and objected to Mr. Nebbia's assessment that his email to Mr. Ciancanelli had an unacceptable tone. *Id.* at 2-3. Mr. Abdelhamid wrote that Mr. Nebbia had decided to "go after [him] for no good reason" and that he believed Mr. Nebbia was trying to "punish [him] for an internal argument" within the legal department. *Id.* at 3-4. Mr. Abdelhamid also stated that his "legal rights" were "violated" in his meeting with Mr. Nebbia and Mr. Ciciotti the previous day, and he requested Mr. Curran's "support." *Id.* at 4. Lane's General Counsel forwarded this email to Mr. Bondanza and Mr. Ciancanelli, and Mr. Bondanza replied, "Please do not respond to the individual. I am handling with HR, the employee is being separated today." ECF No. 29-20, at 2.

Later that day, Ms. Canales sent a letter by email and overnight mail to Mr. Abdelhamid terminating his employment with Lane. ECF No. 37, at 78-79; *see* ECF No. 29-21, at 2-4. The termination letter stated: "Unfortunately, as a result of unprofessional behavior that is substandard to company values and Code of Business Conduct and Ethics, coupled with your refusal to attend a meeting today to discuss these concerns, your employment with the Lane Construction Corporation has been terminated effective immediately." ECF No. 29-21, at 4.

## II. PROCEDURAL HISTORY

In May 2022, Mr. Abdelhamid filed a discrimination and retaliation claim with the Equal Employment Opportunity Commission ("EEOC"). ECF No. 1-2, at 2-3. The EEOC declined to take action on the charge and informed Mr. Abdelhamid of his right to sue in May 2023. *Id.* at 6.

Proceeding pro se, Mr. Abdelhamid filed this suit in August 2023, alleging discrimination on the basis of national origin and retaliation. ECF No. 1 at 3. Lane filed a motion to dismiss, ECF No. 3, which the court granted in part and denied in part in August 2024, ECF No. 12. The court dismissed Mr. Abdelhamid's retaliation claim, which invoked both the False Claims Act and Title VII, ECF No. 12, at 13-19, but the court denied Lane's motion to dismiss the claim of national origin discrimination, *id.* at 5-13. The parties conducted discovery, and in April and May of 2025, the court referred the case for mediation and ordered the appointment of counsel for Mr. Abdelhamid for the limited purpose of mediation, Apr. 30, 2025 Minute Order; ECF No. 22. Mr. Abdelhamid sought an extension of time to complete discovery, ECF No. 25, and while that motion was pending, Lane filed a motion for summary judgment, ECF No. 29. The parties engaged in mediation in July 2025, but it was unsuccessful. ECF No. 30.

In July 2025, the court granted Mr. Abdelhamid's extension motion in part and briefly reopened discovery. ECF No. 31. Specifically, the court ordered Lane to produce by August 5 the entirety of the NEBT prime contract; two subcontracts on which Mr. Abdelhamid had personally worked; human resources, ethics, and disciplinary policies pertaining to employee behavior and performance; and organizational charts for projects on which Mr. Abdelhamid had worked. *Id.* at 2. Lane produced the materials, but excluded certain files it believed to be outside the scope of the court's order. *See* ECF No. 35, at 4-6; ECF No. 38, at 2.

On August 12, Mr. Abdelhamid sent an email to Lane identifying items in the production that "appear[ed] incomplete or require[d] clarification" and stating that he would file a motion to compel if the dispute was not resolved. ECF No. 42-2, at 2-3. Lane responded that it believed its production fully complied with the court's order opening discovery and that Mr. Abdelhamid had "no legitimate grounds" to file a motion to compel. *Id.* at 1. On August 18, Mr. Abdelhamid filed a motion to compel Lane to complete the production and "to supply limited ancillary information necessary to make that production reasonably usable." ECF No. 34, at 1. The court denied Mr. Abdelhamid's motion. ECF No. 38.

On September 30, Lane filed an updated motion for summary judgment. ECF No. 37. The court issued an order advising Mr. Abdelhamid of his obligations under *Fox v. Strickland*, 837 F.2d 507 (D.C. Cir. 1988), and *Neal v. Kelly*, 963 F.2d 453 (D.C. Cir. 1992). ECF No. 39. After the parties completed summary judgment briefing, Lane filed a motion for attorney's fees and expenses incurred in opposing Mr. Abdelhamid's motion to compel, ECF No. 42, and the court ordered Mr. Abdelhamid to file a response, ECF No. 43. Lane's motions for summary judgment and for attorney's fees are fully briefed. ECF Nos. 37, 40 to 42, 44, 45.

## III. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see* Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact" in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, at summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (quoting *Liberty Lobby*, 477 U.S. at 255 (alteration in original)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255); *see Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295-96 (D.C. Cir. 2015).

For a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [his] position," *Liberty Lobby*, 477 U.S. at 252, and he cannot rely on "mere allegations" or conclusory statements, *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).

### B. Pro Se Litigants

The pleadings of pro se parties must be liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). "But on a motion for summary judgment, a *pro se* plaintiff is

held to the same evidentiary burdens as those represented by counsel and must therefore 'provide evidence that would permit a reasonable jury to find in his favor.'" *Husain v. Power*, 630 F. Supp. 3d 188, 195 (D.D.C. 2022) (internal quotation marks omitted) (quoting *Prunte v. Universal Music Grp.*, 699 F. Supp. 2d 15, 21-22 (D.D.C. 2010), *aff'd*, 425 F. App'x 1 (D.C. Cir. 2011) (per curiam)).

### C. Attorney's Fees

The Federal Rules of Civil Procedure authorize the court to award reasonable expenses, including attorney's fees, to the prevailing party in a discovery dispute. *See Parsi v. Daioleslam*, 778 F.3d 116, 125 (D.C. Cir. 2015) (holding that courts "possess broad discretion to impose sanctions for discovery violations under Rule 37"). Under Rule 37, if a motion to compel "is denied, the court . . . must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party . . . who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(B). The court must not order this payment, however, "if the motion was substantially justified or other circumstances make an award of expenses unjust." *Id.* A motion is substantially justified "when there is a 'genuine dispute' or if 'reasonable people could differ' as to the appropriateness of the motion." *Alexander v. Fed. Bureau of Investigation*, 186 F.R.D. 144, 147 (D.D.C. 1999) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). "The burden is on the losing party to affirmatively demonstrate that its discovery conduct was substantially justified." *Collins v. Landry's Inc.*, No. 13-CV-1674, 2014 WL 2770702, at *4 (D. Nev. June 17, 2014); *see* 8B Charles Alan Wright et al., *Federal Practice and Procedure* § 2288 (3d ed. 2026) (noting that "the burden of persuasion [is] . . . on the losing party to avoid assessment of expenses and fees rather than . . . on the winning party to obtain such an award").

## IV. DISCUSSION

### A. Summary Judgment

Mr. Abdelhamid alleges that Lane discriminated against him on the basis of his national origin by requiring him to sign a PIP and terminating him.[7] ECF No. 1, at 3; ECF No. 40, at 1-2. Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The "two essential elements" for a discriminatory treatment claim under Title VII "are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin.'" *Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, 134 F.4th 585, 596 (D.C. Cir. 2025) (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008)). A plaintiff can satisfy these elements by presenting direct or indirect evidence of discrimination. *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 394 (D.C. Cir. 2020).

Lane raises three arguments in favor of summary judgment: (1) that Mr. Abdelhamid has failed to present any direct evidence of discrimination, ECF No. 37, at 11-23; (2) that Lane had legitimate, nondiscriminatory reasons for its actions, which Mr. Abdelhamid has failed to demonstrate were pretextual, *id.* at 23-40; and (3) that Mr. Abdelhamid has failed to show that

---

[7] It is not clear whether Mr. Abdelhamid is challenging the requirement that he take communication skills courses as a discrete adverse employment action separate from Lane's requirement that he sign the PIP and his termination. *See* ECF No. 12, at 7 (assuming that Mr. Abdelhamid raised the communications courses as a separate adverse action at the motion-to-dismiss stage). Mr. Abdelhamid's opposition focuses solely on the PIP and termination, *see generally* ECF No. 40, so the court understands those events to be his challenged adverse actions. And because the parties' evidence regarding those actions is the same, the court analyzes the PIP and termination together.

Lane's decisionmakers knew of Mr. Abdelhamid's national origin, *id.* at 40. Mr. Abdelhamid counters that Lane's proffered reasons are "pretextual" and that genuine issues of material fact exist as to "the PIP's purpose[] and the timing and reasons for termination." ECF No. 40, at 2. The court concludes that Mr. Abdelhamid has presented direct evidence of discrimination, which is sufficient to defeat Lane's motion for summary judgment. *See Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014).

Direct evidence "usually takes the form of a 'statement that itself shows . . . bias [against a protected class] in the [employment] decision.'" *Oviedo*, 948 F.3d at 394 (alterations in original) (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam)). The evidence must "prove[] the particular fact in question without any need for inference." *Hajjar-Nejad v. George Wash. Univ.*, 37 F. Supp. 3d 90, 125 (D.D.C. 2014) (emphasis omitted) (quoting *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006)). In *Wilson*, for example, a retirement home had abolished its employee program for residents, and the D.C. Circuit reversed a grant of summary judgment for the retirement home because the plaintiff had identified two statements constituting direct evidence of age-based discrimination. 753 F.3d at 247-49. First, the decisionmaker had told the home's residents that they "didn't come here to work, [they] came here to retire"; second, he explained that "he had concerns about the older [employees] because 'they were not doing their jobs properly, as from time to time they would be found asleep.'" *Id.* at 247. The Court explained that a "reasonable factfinder could conclude from those statements that a discriminatory intent motivated the [employer's] decision" and that "[b]oth statements indicate[d] . . . 'inaccurate and stigmatizing stereotypes.'" *Id.* at 247-48 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). While the first comment did not refer explicitly to any resident's age, its reference to retirement was "indicative of an inaccurate and

discriminatory assumption that older residents should not want to work or would prefer not to work." *Id.* at 248; *see Townsend v. United States*, No. 14-CV-1644, 2019 WL 4060318, at *13 (D.D.C. Aug. 27, 2019) (finding that a supervisor's statement to an employee to "step aside" and "give up [his] branch chief role for the younger staff that just went through training" "constitute[d] direct evidence of age discrimination" (first alteration in original)).

Mr. Abdelhamid has identified direct evidence that his national origin was a factor in Lane's decisions to require him to sign a PIP and to terminate him. The court previously found that Mr. Abdelhamid's allegation that Mr. Nebbia told him at the February 24, 2022 meeting that he was "different" and that he "needs to follow the culture of the Americans in the company" was sufficient to survive a motion to dismiss. ECF No. 12, at 12 (quoting ECF No. 1-2, at 25). In his deposition, Mr. Abdelhamid similarly testified that Mr. Nebbia "said something along the lines of I know you are different and I know that you might think differently, but we all need to follow the American culture of the company." ECF No. 29-23, at 12. Mr. Abdelhamid also noted in his deposition that he "was the only one [who was] not either American or Italian" at the company. *Id.* at 11. Mr. Abdelhamid's recollection of this exchange differs slightly in his sworn interrogatory responses. In response to Lane's inquiry for the "[f]actual bases for [his] claim that Mr. Nebbia's actions on [February 24, 2022] were unlawful discrimination," Mr. Abdelhamid responded, "During [that] meeting, Mr. Nebbia stated, 'Your style doesn't fit into the company culture here.'" ECF No. 29-70, at 5. Mr. Abdelhamid further explained that "[t]his statement, combined with knowledge of [his] Egyptian origin and pattern of exclusion, forms the basis" for his claim. *Id.* at 5-6. While Mr. Abdelhamid's interrogatory response and deposition testimony are not entirely consistent as to Mr. Nebbia's precise statements that day, the court must view the evidence in the light most favorable to Mr. Abdelhamid. *See Figueroa v. Pompeo*, 923 F.3d 1078,

1085 (D.C. Cir. 2019). The court accordingly assumes that Mr. Nebbia made the comments described in Mr. Abdelhamid's deposition referring expressly to Mr. Abdelhamid's being "different" and to the "American culture of the company." ECF No. 29-23, at 12.

For his part, Mr. Nebbia denies making either statement. *See* ECF No. 37-1, at 8 ("I never said you are different."). Mr. Nebbia asserts that he and Mr. Abdelhamid "did talk multiple times about the culture of our company[]" and about Mr. Nebbia's "interest [that Mr. Abdelhamid] align with the culture of Lane," but Mr. Nebbia denies referring to national origin in particular. *Id.* ("I never made any reference to our culture as far as nation of origin or me being Italian or anything like that."). Lane argues that neither statement constitutes direct evidence of discrimination because neither "overtly and unambiguously refer[s] to [Mr. Abdelhamid]'s national origin or on its face show[s] a motive to discriminate against [him] because he is Egyptian." ECF No. 37, at 20-21.[8] Specifically, with respect to the comment about needing to follow the company's "'American culture,'" Lane argues that a jury "would need to draw the inference that, by [making this statement,] Mr. Nebbia was biased against [Mr. Abdelhamid] because of his national origin, and then connect that bias to the decision reached previously to place [him] on the PIP." *Id.* at 21-22. But, as this court previously explained, "telling an employee who is not from the United States that he is 'different' and that he 'needs to follow the culture of the Americans in the company' is direct evidence of national origin discrimination." ECF No. 12, at 12. While Lane is

---

[8] Mr. Abdelhamid does not respond to Lane's argument that the summary judgment record lacks direct evidence of discrimination. *See generally* ECF No. 40. The court accordingly "*may* treat that argument as conceded." *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 66 (D.D.C. 2014) (emphasis added). In light of Mr. Abdelhamid's pro se status and his assertion that Mr. Nebbia's "[r]emarks[] [are] disputed," ECF No. 40-1, at 3, the court will not treat the argument as conceded and will consider whether Mr. Nebbia's alleged remarks at the February 24, 2022 meeting constitute direct evidence of discrimination.

correct that Mr. Nebbia's alleged remarks do not refer specifically to Mr. Abdelhamid's Egyptian heritage, the statements explicitly refers to Mr. Abdelhamid as being "different" and not in line with "American culture," and a reasonable jury could conclude from these statements that Mr. Abdelhamid was being placed on a PIP and terminated because he was not sufficiently "American." *See* U.S. Equal Emp. Opportunity Comm'n, *EEOC Enforcement Guidance on National Origin Discrimination* (2016) (noting that "discrimination against a person because [he] does *not* belong to a particular ethnic group" may constitute national origin discrimination).[9] The context of Mr. Nebbia's comments also matters. Mr. Nebbia made the comments around the same time that he determined that Mr. Abdelhamid should be placed on a PIP in part because of his "misalignment with some of Lane Company values and culture." ECF No. 29-10, at 2. A reasonable jury could thus conclude that Mr. Nebbia's repeated references to Lane's "culture" were synonymous with American culture.

Additionally, while direct evidence must "itself" show "bias . . . in the [employment] decision," *Oviedo*, 948 F.3d at 394 (second alteration in original) (quoting *Ayissi-Etoh*, 712 F.3d at 576), courts have found direct evidence even where the decisionmaker did not expressly name the relevant protected characteristic. For example, in *Tucker v. Johnson*, 211 F. Supp. 3d 95 (D.D.C. 2016), an employer allegedly told the plaintiff "that she 'need[ed] to get in [her] place' and that she should 'learn [her] place'" and that the employer had "had a similar conversation with his daughters, telling them that they 'have really got to learn [their] place.'" *Id.* at 103 (alterations in original). The court concluded that those statements were "direct evidence of gender bias" because a "reasonable jury could interpret [the] statements . . . to mean that [the plaintiff] needed

---

[9] *Available at* https://perma.cc/XX93-Q26P.

to learn to subordinate herself to male leadership and that, if she did not, there would be employment consequences." *Id.* Here, too, a reasonable jury could interpret Mr. Nebbia's statements about Mr. Abdelhamid's being "different" and deviating from "American culture" to mean that Mr. Abdelhamid was not American enough.[10]

The statements at issue were also "made by a decisionmaker" and "tied temporally and contextually to the challenged employment action[s]." *Equal Emp. Opportunity Comm'n v. R&R Janitorial, Painting, & Bldg. Servs., Inc.*, No. 21-CV-2539, 2025 WL 2409751, at *7 (D.D.C. Aug. 20, 2025). First, it is undisputed that Mr. Nebbia was involved in the decisions to place Mr. Abdelhamid on a PIP and to terminate him. *See* ECF No. 37, at 70-71, 75-77; ECF No. 29-1 at 17, 20, 22; *see also* ECF No. 41, at 18 (Lane's reply brief referring to Mr. Nebbia as "Lane's decisionmaker"). Mr. Nebbia's comments are also causally linked to both adverse employment actions. While Lane argues that the decision to place Mr. Abdelhamid on a PIP predated Mr. Nebbia's alleged comments, *see* ECF No. 37, at 21-22, the remarks can still be direct evidence of motivation for that decision, especially because Mr. Nebbia's statements were "made in the course of explaining or justifying" the decision to place Mr. Abdelhamid on a PIP, *R&R Janitorial*, 2025 WL 2409751, at *8; *see Woodberry v. Tischner*, No. 18-CV-3081, 2023 WL 5672625, at *4 (D.D.C. Sep. 1, 2023) (noting that "even if the decision to transfer [the plaintiff] had already been made when . . . the remark [was made], a decisionmaker's post-decision

---

[10] Lane disputes whether Mr. Nebbia or any other decisionmakers knew Mr. Abdelhamid's specific national origin. ECF No. 37, at 40. The court notes, however, that decisionmakers "need not have known that [Mr. Abdelhamid] was from [Egypt] to discriminate on the basis of national origin." *Rodriguez v. Wash. Metro. Area Transit Auth.*, No. 19-CV-3710, 2021 WL 3722729, at *4 (D.D.C. Aug. 23, 2021); *see supra* p. 25 & n.9. Lane does not dispute that decisionmakers were aware of Mr. Abdelhamid's non-American national origin, and a jury could reasonably infer that Mr. Nebbia's comment about Mr. Abdelhamid's being "different" shortly before referring to the company's "American culture" concerned Mr. Abdelhamid's national origin.

statements can still be direct evidence of the decisionmaker's reasons for making that decision" (internal quotation marks and citation omitted)). And with respect to the termination, Mr. Nebbia told Mr. Abdelhamid during the PIP meeting that he could be terminated if he refused to sign and follow the PIP, and Mr. Abdelhamid was terminated the next day. *See* ECF No. 37, at 73-79. Lane asserts that Mr. Abdelhamid was terminated "solely because of his unprofessional behavior and refusal to . . . meet[] to discuss Lane's concerns with that behavior," *id.* at 23, but Mr. Abdelhamid's refusal to meet the following day directly stemmed from the "[d]iscrimination" he perceived from Mr. Nebbia's alleged statement, ECF No. 29-18, at 2-3; *see* ECF No. 29-23, at 12; *see also Coats v. DeVos*, 232 F. Supp. 3d 81, 87-88 (D.D.C. 2017) (finding direct evidence where the "statement at issue was not a 'stray remark[],' but, rather, was allegedly made in response to the question why [the plaintiff] was targeted for an adverse employment action" (citations omitted)). Lane thus cannot argue that there is no clear nexus between Mr. Nebbia's statement and Mr. Abdelhamid's termination, given that the meeting Mr. Abdelhamid refused to attend was a continuation of the previous day's conversation. *See Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 44 (D.D.C. 2014) ("Such a nexus can be shown if the remark was made by an individual with the power to influence [the plaintiff]'s termination, and the remark was temporally close in time to the termination."). Accordingly, a reasonable jury could conclude that Mr. Abdelhamid's failure to "follow the American culture" of Lane was a factor in his termination. *Cf. R&R Janitorial*, 2025 WL 2409751, at *7 (finding that a statement that "this is America" rebuking Hispanic employees for speaking Spanish did not constitute direct evidence *without a causal connection* to the employer's adverse actions (internal quotation marks and citation omitted)).

Lane relies on a number of cases to argue that Mr. Nebbia's alleged remarks are not discriminatory on its face, but none is persuasive. ECF No. 37, at 14-19. Lane's strongest example is *Sun v. District of Columbia*, 133 F. Supp. 3d 155 (D.D.C. 2015), where the employer had written in an email to the plaintiff, "I freely admit to discussing with you that 'announcing' that you are taking additional leave is a poor approach in American culture. . . . You appear to have turned my simple explanation of common courtesy in American culture . . . into a suggestion that you become fawningly obsequious." *Id.* at 165-66 (citation omitted). The court concluded that, although the email was "condescending" and included "an unnecessary reference to [the] plaintiff's cultural differences," it fell "short of direct evidence of discriminatory animus" based on national origin. *Id.* at 166. While Mr. Nebbia's remarks also referred to "American culture," his statement and the statement in *Sun* were made in materially different contexts. As the court in *Sun* noted, "[m]ore important[ly]," the supervisor's email—about the manner in which the plaintiff had taken and requested leave—"had nothing to do with the adverse employment decision underlying th[e] lawsuit," which was the plaintiff's termination for engaging in the unauthorized practice of law. *Id.* at 166-67; *see id.* at 161-62. Here, in contrast, Mr. Nebbia's comment was made in the course of explaining an adverse employment decision—requiring Mr. Abdelhamid to sign a PIP, which ultimately led to his termination. Accordingly, the email in *Sun*, which was "unrelated to the decisional process itself," *id.* at 164 (quoting *Hajjar-Nejad*, 37 F. Supp. 3d at 125), is distinguishable from Mr. Nebbia's statements.

Likewise, *Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618 (7th Cir. 2002), does little to advance Lane's position. There, the Seventh Circuit held that an employer's statements "made to the effect that he wondered why, after living in the United States for 12 years and being married to an American, [the plaintiff] had not become more assimilated into the culture"

were not direct evidence of national origin discrimination. *Id.* at 625. The court found "nothing in those remarks to show a bias against persons of Spanish heritage," with no additional explanation. *Id.* This court, however, declines to impose a similar requirement that a statement must refer to a plaintiff's specific country of origin to constitute direct evidence of national origin discrimination. *See Equal Emp. Opportunity Comm'n v. WC&M Enters., Inc.*, 496 F.3d 393, 401 (5th Cir. 2007) ("[A] party is able to establish a discrimination claim based on [his] own national origin even though the discriminatory acts do not identify the victim's actual country of origin."). Mr. Nebbia's suggestion that Mr. Abdelhamid was "different" and "need[ed] to follow the American culture," ECF No. 29-23, at 12, was "a clear reference to [his] national origin as being outside of the United States," *Udeh v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. 20-CV-3745, 2021 WL 3142026, at *6 (D. Md. July 26, 2021) (finding direct evidence of discrimination based on criticism for "not being 'American enough'" (citation omitted)).

In other cases relied upon by Lane, the plaintiffs failed to show that the speakers who had made comments implicating national origin were involved in the adverse employment decisions, which, as noted, is not the case here. *See Lin v. Bowling Green State Univ.*, No. 11-CV-4, 2012 WL 1981506, at *6 (N.D. Ohio May 31, 2012); *Shahmaleki v. Kan. State Univ.*, No. 15-CV-7766, 2016 WL 3522040, at *4-5 (D. Kan. June 28, 2016); ECF No. 37, at 15-17. And in other cases, the purported direct evidence consisted of comments about "culture" or "corporate culture" more generally, rather than express references to national origin. *See Valles-Hall v. Ctr. for Nonprofit Advancement*, 481 F. Supp. 2d 118, 141 (D.D.C. 2007) ("cultural thing"); *Walden v. St. Gobain Corp.*, 323 F. Supp. 2d 637, 643-44 (E.D. Pa. 2004) ("corporate culture"); *Kazin v. Metro-N. Commuter R.R.*, No. 91-CV-1331, 1994 WL 68167, at *5 (S.D.N.Y. Mar. 1, 1994) (same); *Beshty v. Gen. Motors*, 327 F. Supp. 2d 208, 214 (W.D.N.Y. 2004) ("[company] 'culture'"); *Casanova v.*

*Gen. Mills Rests., Inc.*, No. 94-CV-4386, 1997 WL 473840, at *5 (E.D.N.Y. Aug. 15, 1997) (failure to "fit into the Red Lobster family" and employer being "tired of looking at [the plaintiff's] face"); *Naumova v. Sharonview Fed. Credit Union*, No. 22-CV-4632, 2024 WL 4297645, at *3 (D.S.C. Sep. 26, 2024) ("culture fit"), *aff'd*, No. 24-1952, 2025 WL 671473 (4th Cir. Mar. 3, 2025); *Sabinson v. Trs. of Dartmouth Coll.*, No. 05-CV-424, 2007 WL 4191943, at *6 (D.N.H. Nov. 21, 2007) (department "culture"), *aff'd*, 542 F.3d 1 (1st Cir. 2008); ECF No. 37, at 15-19.[11]

In sum, viewing the evidence in the light most favorable to Mr. Abdelhamid, Mr. Nebbia's remarks "itself show[] . . . bias in the employment decision[s]" and "qualifies as direct evidence." *Wilson*, 753 F.3d at 247 (second alteration in original) (internal quotation marks and citation omitted). To be sure, Lane presents considerable evidence that multiple supervisors perceived issues in Mr. Abdelhamid's communication style and interpersonal skills. *See, e.g.*, ECF No. 29-10, at 2 (Mr. Nebbia's February 18, 2022 email sharing concerns with Mr. Abdelhamid's "level of self-awareness during normal and difficult conversations" and "limited interest in listening to constructive feedback[]"); ECF No. 29-34, at 3 (Mr. Nebbia's email describing the tone of Mr. Abdelhamid's email to Mr. Ciancanelli as "unacceptable"); ECF No. 37-1, at 10

---

[11] Lane's reliance on *Rapold v. Baxter International, Inc.*, No. 08-CV-7369, 2010 WL 3087460 (N.D. Ill. Aug. 3, 2010), is puzzling. *See* ECF No. 37, at 16-17. While the court there did not find the employer's comments to be direct evidence of national origin discrimination, the court concluded that the plaintiff "c[ame] close to pointing to the proverbial 'smoking gun'" in the employer's remarks about the plaintiff's "European cultural differences" and "cultural mismatch" with the company. *Rapold*, 2010 WL 3087460, at *9 (internal quotation marks omitted). The employer argued that her comments were "directed more at [the plaintiff]'s inability to fit within [the company's] team approach and not about his national origin," but the court found that it was for a jury to "choose between competing reasonable inferences" from the employer's comments. *Id.* at *10. Here, too, even if Mr. Nebbia's comments are not direct evidence of discrimination, they constitute strong circumstantial evidence that would allow a jury to infer discriminatory intent.

(Mr. Nebbia's deposition discussing what he perceived to be Mr. Abdelhamid's disrespectful attitude toward the mediator); ECF No. 29-68 at 4 (Mr. Ciciotti's declaration agreeing that the email to Mr. Ciancanelli was "not in line with Lane's values and culture of teamwork and mutual respect" and stating that Mr. Abdelhamid "was not open or receptive" to his advice). "[B]ut at the summary judgment stage, an alternative interpretation of that kind cannot overcome the need to draw inferences in the non-moving party's favor." *Wilson*, 753 F.3d at 248. And while Mr. Nebbia strongly denies making the comments referring to national origin, whether he "in fact made the comments attributed to him is a factual dispute that cannot be resolved by the court at this stage." *Tucker*, 211 F. Supp. 3d at 103. The court accordingly denies Lane's motion for summary judgment.[12]

**B. Attorney's Fees**

Lane also moves for attorney's fees and expenses incurred in opposing Mr. Abdelhamid's motion to compel production of discovery, ECF No. 34. ECF No. 42. As noted, if a court denies a motion to compel discovery, the court "*must*, after giving an opportunity to be heard, require the movant[] . . . to pay the party . . . who opposed the motion its reasonable expenses incurred in opposing the motion," unless the motion was "substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(B) (emphasis added). Because the court

[12] Because the court concludes that Mr. Abdelhamid has proffered direct evidence of discrimination, the court need not address the parties' argument regarding indirect evidence. *See Wilson*, 753 F.3d at 247 ("If the plaintiff offers direct evidence of discriminatory intent, that evidence will generally entitle [the] plaintiff to a . . . trial." (second alteration in original) (internal quotation marks and citation omitted)); *Mousselli v. Nielsen*, 754 F. App'x 7, 10 (D.C. Cir. 2018) (considering decisionmaker knowledge in the analysis of indirect evidence outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

denied Mr. Abdelhamid's motion to compel, ECF No. 38, and that motion was not substantially justified, the court must grant Lane's motion for attorney's fees.[13]

Mr. Abdelhamid's motion to compel challenged Lane's compliance with the court's July 2025 discovery order, which required Lane to produce certain contracts, company policies, and organizational charts for projects on which Mr. Abdelhamid had worked between 2019 and 2022. ECF No. 34, at 1-3; *see* ECF No. 31, at 2. After Lane produced documents pursuant to the court's order, Mr. Abdelhamid argued in his motion to compel that the production was unusable and incomplete, citing Lane's "eleventh-hour" production and "newly discovered" organizational charts. ECF No. 34, at 4 (internal quotation marks omitted). The court denied Mr. Abdelhamid's motion to compel, finding no evidence that Lane had shirked its discovery obligations. ECF No. 38.

Mr. Abdelhamid argues that his motion to compel was substantially justified because (1) he had "legitimate completeness concern[s]" based on Lane's supplemental production of organizational charts; (2) Lane's "production's folder structure and undisclosed exclusions created reasonable completeness and usability concerns"; (3) his motion "sought verification and usability" and "did not seek to 'expand' discovery"; and (4) his follow-up requests for Mr. Ciciotti's communications and communications between the HR and legal departments "were not 'already denied.'" ECF No. 44, at 2-4. The court has already addressed these arguments in its denial of Mr. Abdelhamid's motion to compel. With respect to the organizational charts, the court found that the production of newly discovered organizational charts "d[id] not suggest that Lane's

---

[13] Mr. Abdelhamid does not argue that an award of reasonable expenses would be "unjust," only that his motion was "substantially justified." Fed. R. Civ. P. 37(a)(5)(B); *see generally* ECF No. 44.

production [wa]s incomplete," and it concluded that Lane had "fulfilled its duty" to supplement discovery by promptly producing the additional charts. ECF No. 38, at 3.

As for the excluded categories of files from Lane's production, the court concluded that Mr. Abdelhamid had "offer[ed] no response to Lane's explanation that the excluded files . . . fell outside the scope of the court's discovery order" and "fail[ed] to explain why the production remains unusable to him." *Id.* at 4. Because Mr. Abdelhamid failed to support his claims or refute Lane's claims with specific facts or evidence, he cannot claim he was substantially justified in bringing the motion. *See Langley v. Garcia*, No. 16-CV-1299, 2020 WL 1532313, at *1 (E.D. Cal. Mar. 31, 2020) (finding that the plaintiff was not substantially justified in bringing motions to compel because he "provided no facts or evidence to support the allegations in his motions" and the motions were "instead based on self-serving beliefs and bare assertions"). And while Mr. Abdelhamid adds details in his opposition to Lane's motion for attorney's fees about the gaps in Lane's production, ECF No. 44, at 3-4, he still does not explain how those exclusions caused usability issues, *see Gardner-Alfred v. Fed. Rsrv. Bank of N.Y.*, No. 22-CV-1585, 2023 WL 2414951, at *1 (S.D.N.Y. Mar. 8, 2023) (rejecting the argument that the plaintiffs' "honest[] belie[f] that Defendant had failed to satisfy its requirements to produce documents" made their motion to compel "substantially justified").

Additionally, Mr. Abdelhamid's demands for a search certification and component index were not substantially justified based on "verification and usability" concerns. ECF No. 44, at 4. As the court previously explained, Lane provided a Bates overlay to help Mr. Abdelhamid with the usability of the production and produced documents in their native format per Mr. Abdelhamid's request, even though Lane was not obligated to do so. ECF No. 38, at 2-4.

Lane produced files in "the usual course of business," *id.* at 3 (internal quotation marks omitted), complying with its discovery obligations and the court's discovery order.[14]

Finally, the court is unpersuaded that Mr. Abdelhamid's duplicative requests for certain communications by Mr. Ciciotti and communications between the HR and legal departments, *see* ECF No. 34, at 2, 4-5, were substantially justified, because the court had already denied similar requests in its July discovery order, *see* ECF No. 31, at 2; *cf. Clark v. Trisler*, No. 22-CV-559, 2024 WL 5434027, at *2 (D. Haw. Aug. 7, 2024) (awarding attorney's fees and expenses because "[m]oving to compel production of identical discovery a second time . . . unnecessarily delayed th[e] litigation"). Mr. Abdelhamid argues that these requests were "narrow and tethered to what [he had] learned from" Lane's production *after* the court's July discovery order, including Lane's voluntary production of his full electronic mailbox. ECF No. 44, at 4-5. But Lane had no obligation to produce additional "follow-up" discovery based on its own "courtesy" production, ECF No. 45, at 5 (internal quotation marks omitted), so Mr. Abdelhamid was not justified in seeking to compel such discovery. In any event, the court's "overwhelming decision for [Lane] on the merits of [the motion to compel] is sufficient to show that [Mr. Abdelhamid]'s objections

---

[14] What is more, Mr. Abdelhamid ignored Lane's assurances that it had complied with the court's July discovery order, as well as Lane's genuine attempts to decipher what additional documents Mr. Abdelhamid believed he was entitled to. *See generally* ECF No. 42-2. After Mr. Abdelhamid contacted Lane about alleged deficiencies in its production, Lane told him that it believed the entire prime contract and two subcontracts had been produced and requested that Mr. Abdelhamid specify which documents he believed were missing. *Id.* at 2. Lane also advised Mr. Abdelhamid that his requests fell outside the scope of the court's discovery order and the Federal Rules of Civil Procedure and warned him that it would oppose any motion to compel "and, as appropriate, seek sanctions if such motion is filed." *Id.* Mr. Abdelhamid's failure to engage with Lane's attempts to resolve the dispute outside of court further counsels in favor of an award of attorney's fees. *See Martin v. Hannu*, No. 21-CV-364, 2023 WL 11113646, at *4 (D. Or. Aug. 15, 2023) (finding that the plaintiffs' motion to compel was not substantially justified in part because the defendants had "repeatedly and consistently" informed the plaintiffs that they had "no additional responsive documents" (internal quotation marks and citation omitted)).

were not substantially justified." *DL v. District of Columbia*, 251 F.R.D. 38, 49 (D.D.C. 2008). And while Mr. Abdelhamid maintains that his motion was filed in good faith to enforce the court's July discovery order, *see* ECF No. 44, at 5, a plaintiff's intentions in filing a motion to compel do not affect the court's analysis under Rule 37(a)(5)(B), *see Pegoraro v. Marrero*, No. 10-CV-51, 2012 WL 5964395, at *4 (S.D.N.Y. Nov. 28, 2012) ("Good faith in making a motion . . . is not the standard by which courts assess whether to award expenses under Rule 37(a)(5)(B)."). Accordingly, Lane is entitled to an award of reasonable expenses, including attorney's fees. The court will determine the amount of fees after the parties complete briefing on that issue.

## V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 37, is **DENIED**, and Defendant's Motion for Attorney's Fees and Expenses, ECF No. 42, is **GRANTED**. It is further **ORDERED** that the parties shall file a joint status report proposing next steps in this litigation on or before October 29, 2026. And it is further **ORDERED** that Defendant shall file an affidavit detailing its reasonable expenses incurred in opposing Plaintiff's Motion to Compel, ECF No. 34, on or before October 13, 2026, and Plaintiff shall file a response, if any, on or before October 20, 2026.

**SO ORDERED.**

LOREN L. ALIKHAN
United States District Judge

Date: September 29, 2026